# EXHIBIT 1

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC<br>FEPA | 570-2023-03409 |

| D.C. Office Of Human Rights | and EEOC |
|---|---|
| State or local Agency, if any | |

| I Name (indicate Mr., Ms., Mrs., Miss, Mx., Dr., Hon., Rev.) | Home Phone | Year of Birth |
|---|---|---|
| Fabriciana De Soriano | (347) 207-0175 | |

Street Address

244 5th Avenue Suite N240

NEW YORK, NY 10001

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| The School for Ethics and Global Leadership | 15 - 100 Employees | |

Street Address

202 East Capitol Street NE 1528 18th St NW

WASHINGTON, DC 20003

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON | DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|---|
| | Earliest | Latest |
| Disability, Sex | 06/26/2023 | 07/11/2023 |

THE PARTICULARS ARE (*If additional paper is needed, attach extra sheet(s)*):

I was hired as a Graduate Intern and Teaching Fellow on June 22, 2023, at The School of Ethics and Global Leadership (SEGL). I was terminated on July 11, 2023.

On or about the week of June 26, 2023, Mr. Noah Bopp, Founder and Head School Teacher, massaged my shoulder multiple times, and I told him to stop. Around this time, Shizuha Hatori, Academic Dean, touched the outside of my thigh to the middle while I was wearing a skirt. I reported this to Mr. Bopp, who said that faculty cannot be turning on one another and faculty is supposed to cover for one another, and he also smiled and winked at me. SEGL did not have a harassment policy or manual. I also have a disability, that was caused by being sex trafficked, which I brought up to Mr. Bopp when I interviewed, and the accommodation I requested was denied when these incidents occurred.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| I declare under penalty of perjury that the above is true and correct.<br><br>**Digitally Signed By: Fabriciana De Soriano**<br><br>**08/04/2023**<br><br>Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (*month, day, year*) |

Page 1 of 3

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC<br>FEPA | 570-2023-03409 |

| | |
|---|---|
| **D.C. Office Of Human Rights** | and EEOC |
| *State or local Agency, if any* | |

On July 11, 2023, I was terminated from SEGL. Mr. Bopp said I was terminated for speculating that a student had a crush on me and for reporting sexual harassment. The student would touch my arms and waist, one time of which their hand came into contact with my chest and made comments about my appearance. A different student made inappropriate and unwanted inquiries into my sexual history and virginity. These experiences made me very uncomfortable, and I reported them to Mr. Bopp, who minimized the reports by calling it student stuff. No student was penalized for these comments, and instead I was terminated for reporting the incidents.

I believe I was discriminated and discharged based on my sex (female), in violation of Title VII of the Civil Rights Act of 1964, as amended. I believe I was also discriminated against due to my disability, in violation of the Americans with Disability Act of 1990, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct.<br><br>**Digitally Signed By: Fabriciana De Soriano**<br><br>08/04/2023<br><br><div align="right">*Charging Party Signature*</div> | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED   AND   SWORN   TO   BEFORE   ME   THIS   DATE<br>*(month, day, year)* |

# EXHIBIT 2

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | [X] FEPA <br> [ ] EEOC | 24-300-P(N) |

**D.C. Office Of Human Rights**

| Name (indicate Mr., Ms., Mrs.) | E-Mail Address | Home Phone | Date of Birth |
|---|---|---|---|
| **Fabriciana de Soriano** | **fabricianadesoriano@gmail.com** | **(347) 207-0175** | **N/A** |

| Street Address | City, State and ZIP Code |
|---|---|
| **244 5th Avenue, Suite N240** | **New York, NY 10001** |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others.

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| **The School for Ethics and Global Leadership** | **20+** | **(202) 680-3264** |

| Street Address | City, State and ZIP Code |
|---|---|
| **202 East Capitol Street NE,** | **Washington, DC 20003** |

DISCRIMINATION BASED ON (Check appropriate box(es).)

| [ ] RACE | [ ] COLOR | [ ] SEX | [ ] RELIGION | [ ] NATIONAL ORIGIN |
|---|---|---|---|---|
| [X] RETALIATION | [ ] AGE | [ ] DISABILITY | [X] OTHER (Specify below.) | |

**Victims of Domestic Violence, Sexual Offenses, and Stalking Amendment Act of 2018**

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **06/23/2023**    Latest **07/11/2023**

[ ] CONTINUING ACTION

THE PARTICULARS ARE:

Complainant filed her Initial Written Complaint with OHR on July 27, 2023.

Respondent hired me on June 23, 2023, Graduate Intern/Fellow. I believe that Respondent has discriminated against me and retaliated against me for exercising my rights under the Victims of Domestic Violence, Sexual Offenses, and Stalking Amendment Act of 2018 (DVSOS) for the following reasons:

**FAILURE TO ACCOMMODATE – DVSOS**

In April 2023, I asked Respondent's Founder and supervisor (Noah Bopp, male) for safe working environment (private room, and no physical touched) because I was sexually abused and victim of sex trafficking. I was given a private room, but the no physical contact was not respected. From June 23, 2023, until June 29, 2023, I was subjected to unwelcome sexual harassment from Mr. Bopp, the Founder, Faculty and Academic Dean Shizuha Hatori, as well as a student (first name, Veera).

Mr. Bopp came up behind me and placed his hand on my shoulder, squeezing it in the Stern Common Room and again in the Academic Building. Separately, Ms. Hatori also touched me in an unwanted way while she patted my thigh while I wore a skirt during a community meeting in the main common room. Finally, a student (Veera) also touched me in an unwanted way when she repeatedly put her hand/hands on my waist and arms, which came into contact with my breast. Another student (Joey) asked intrusive, inappropriate, and unwanted sexual questions about my virginity.

On June 29, 2023, I verbally filed a complaint of sexual harassment with Ms. Hatori, but no action was taken to protect me. I contend that Respondent denied me a reasonable accommodation as a victim of sexual assault (providing me safety from the individual who had assaulted me), as required by the Employment Protections for Victims of Domestic Violence, Sexual Offenses, and Stalking Amendment Act of 2018.

**RETALIATION (Discharge) – Requesting/Using a DVSOS Accommodation**

On July 11, 2023, Mr. Bopp terminated my employment alleging that I violated the Health Insurance Portability and Accountability Act of 1996 by seeing a student medical record. I believe that Respondent terminated my employment in retaliation for me requesting and using a reasonable accommodation under the DVSOS Amendment Act of 2018.

Therefore, I charge Respondent with unlawful discriminatory acts in violation of the Employment Protections for Victims of Domestic Violence, Sexual Offenses, and Stalking Amendment Act of 2018, which amended the DC Human Rights Act of 1977. I have not commenced any other civil, criminal, or administrative action based on the above allegations.

**Changes in Address and Number:**

**769 Arnow Avenue #3G Bronx, NY 10467**

**646-483-1160**

| | |
|---|---|
| I want this charge filed with the State or local Agency, if any. I will advise the Agency if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | |
| I declare under penalty of perjury that the above is true and correct. | |

7/10/2024

Date

*Charging Party Signature*

# EXHIBIT 3

 **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Washington Field Office**
131 M Street, NE Fourth Floor, Suite 4NWO2F
Washington, DC 20507
(800) 669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 09/19/2024

**To:** Fabriciana De Soriano
244 5th Avenue, Suite N240
NEW YORK, NY 10001

Charge No: 570-2023-03409

EEOC Representative and email:   PHILLIP HOEFS
Deputy Director
phillip.hoefs@eeoc.gov

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 570-2023-03409.

On behalf of the Commission,

Digitally Signed By:Mindy E. Weinstein
09/19/2024

Mindy E. Weinstein
Director

Cc:
Noah Bopp
The School for Ethics and Leadership
1528 18th Street NW
Washington, DC 20026

EMMA LEHENY
POTOMAC LAW GROUP
1717 PENNSYLVANIA AVE NW STE 1025
Washington, DC 20006

Ernesto Soriano
769 Arnow Avenue #3G
BRONX, NY 10467


Please retain this notice for your records.

# EXHIBIT 4

**From:** **Pamela Keith** pamkeith@centerforemploymentjustice.com
**Subject:** OHR Complaint No 24-300-P(N)
**Date:** September 17, 2025 at 11:42 AM
**To:** michelle.seyler@dc.gov, Fabriciana De Soriano fabricianadesoriano@gmail.com



Dear Ms. Seyler-Fruitwala: My name is Pamela Keith. I am attorney at the Center for Employment Justice. I have been retained by Fabriciana De Soriano to be her legal counsel in all matters related to her dispute with the School for Ethics and Global Leadership in the above-referenced pending OHR Complaint. I have copied my client on this email. I am writing to indicate that my client has litigation involving this Defendant pending in Federal court, and wishes to pursue the matters raised in the above-referenced OHR complaint in court. She is therefore providing written notice of withdrawal of the OHR charge via this email. Should you require that she signs a document indicating her desire to withdraw the OHR charge, please send said form to me at the below contact email and I will have her sign it. Thank you for your prompt attention to this matter as Ms. De Soriano is planning to file her First Amended Complaint which will address the claims before OHR on or before September 26, 2025.

Respectfully,
Pamela M. Keith
CENTER FOR EMPLOYMENT JUSTICE
650 Massachusetts Ave. NW
Suite 600
Washington, DC 20001
(202) 800-0292
pamkeith@centerforemploymentjustice.com
Counsel for Ms. De Soriano

From: **EnforcementPurple, OHR (OHR)** ohr.enforcementpurple@dc.gov
Subject: Re: OHR Complaint No 24-300-P(N)
Date: September 23, 2025 at 1:50 PM
To: Pamela Keith pamkeith@centerforemploymentjustice.com
Cc: Fabriciana De Soriano fabricianadesoriano@gmail.com

Dear Ms. Keith,

Thank you for your email. Please have Ms. De Soriano fill out and return the attached withdrawal request form, signing on both lines and checking the box indicating that she wishes to receive a Notice of Right to Sue.

Sincerely,

Jaime Wojdowski
Enforcement Manager
OHR Enforcement Unit – **Purple Team**

District of Columbia Office of Human Rights
441 4th Street NW, Suite 570N
Washington, DC  20001

Main: 202.727.4559
Fax: 202.727.9589

ohr.dc.gov
facebook.com/DCOHR
twitter.com/dchumanrights
instagram.com/dchumanrights

*OHR will be operating remotely during the public health emergency. For more information on our operating status click here. For the latest news on the District's response to COVID-19, go to coronavirus.dc.gov.*

STATEMENT OF CONFIDENTIALITY: The information contained in this electronic message and any attachments to it are intended for the exclusive use of the addressees and may contain confidential or privileged information. If you are not the intended recipient, please notify the sender immediately and destroy all copies of this message and any attachments.

---

**From:** Pamela Keith <pamkeith@centerforemploymentjustice.com>
**Sent:** Wednesday, September 17, 2025 11:45 AM
**To:** EnforcementPurple, OHR (OHR) <ohr.enforcementpurple@dc.gov>
**Cc:** Fabriciana De Soriano <fabricianadesoriano@gmail.com>
**Subject:** Fwd: OHR Complaint No 24-300-P(N)

CAUTION: This email originated from outside of the DC Government. Do not click on links or open attachments unless you recognize the sender and know that the content is safe. If you believe that this email is suspicious, please forward to phishing@dc.gov for additional analysis by OCTO Security Operations Center (SOC).



**Office of Human Rights**
DISTRICT OF COLUMBIA

One Judiciary Square
441 4th Street, NW, Suite 570N
Washington, DC 20001
202.727.4559 tel
202.727.9589 fax
www.ohr.dc.gov

## COMPLAINANT'S CHARGE OF DISCRIMINATION WITHDRAWAL FORM

**COMPLAINANT NAME:** _____

_____  v.  _____
_____Complainant_____            _____Respondent_____
OHR.:_____             EEOC No.:_____

By completing this form, the Complainant hereby withdraws the Charge of Discrimination filed at the DC Office of Human Rights (OHR) and cross-filed with the United States Equal Employment Opportunity Commission (US EEOC) and is advised of the following rights and obligations:

I am aware the Charge of Discrimination I have filed is pending the administrative procedure provided by OHR and has been cross filed with the United States Equal Employment Opportunity Commission (US EEOC).

I am aware a request to withdraw a Charge of Discrimination must be approved by the OHR and US EEOC.

I am aware the OHR and US EEOC protect my right to file a Charge of Discrimination.

I am aware it is unlawful for me to be threatened, intimidated, or harassed because I have filed a Charge of Discrimination as provided by the United States Civil Rights Act of 1964, as amended.

I am aware it is unlawful for me to be threatened, intimidated, or harassed because I have filed a charge of discrimination as provided by the DC Human Rights Act of 1977, as amended.  Each agency will review this withdrawal form and take the appropriate action regarding the Charge of Discrimination.

I have not been forced, intimidated, coerced, or otherwise influenced to submit this Charge of Discrimination withdrawal form.

I am submitting this Charge of Discrimination withdrawal form because:
_____
_____

I wish to withdraw the Charge of Discrimination I have filed with the D.C. Office of Human Rights:


_____        _____
**Complainant's Signature**                **Date**

I wish to withdraw the Charge of Discrimination I have filed with the Equal Employment Opportunity Commission:

_____        _____    ☐ **Please provide a US EEOC Notice of Right to Sue**
**Complainant's Signature**                **Date**

| SEND TO: | D.C. Office of Human Rights | EEOC USE ONLY: | |
|---|---|---|---|
| | 441 4th Street, N.W. | _____ Approve | _____ Date |
| | Suite 570N | _____ Deny | _____ Date |
| | Washington, D.C. 20001 | Director: | |

OHR.WITHDRAWAL 1/1
Revised February 2014

**From: Pamela Keith** pamkeith@centerforemploymentjustice.com  🖉
**Subject:** Re: OHR Complaint No 24-300-P(N)
**Date:** September 23, 2025 at 5:17 PM
**To:** EnforcementPurple, OHR (OHR) ohr.enforcementpurple@dc.gov



Hello Ms. Wojodowski:  Please find attached Ms. De Soriano's signed withdrawal document.



**Office of Human Rights**
DISTRICT OF COLUMBIA

One Judiciary Square
441 4th Street, NW, Suite 570N
Washington, DC 20001
202.727.4559 tel
202.727.9589 fax
www.ohr.dc.gov

### COMPLAINANT'S CHARGE OF DISCRIMINATION WITHDRAWAL FORM

COMPLAINANT NAME: Fabriciana De Soriano

| Fabriciana De Soriano | v. | The Salmon for Ebola and Cirrus Leadership, Asset Root and Bravika Nabini |
|---|---|---|
| **Complainant** | | **Respondent** |
| OHR.: 24-300-P(N) | | EEOC No.: 570-2023-03406 |

By completing this form, the Complainant hereby withdraws the Charge of Discrimination filed at the DC Office of Human Rights (OHR) and cross-filed with the United States Equal Employment Opportunity Commission (US EEOC) and is advised of the following rights and obligations:

I am aware the Charge of Discrimination I have filed is pending the administrative procedure provided by OHR and has been cross filed with the United States Equal Employment Opportunity Commission (US EEOC).

I am aware a request to withdraw a Charge of Discrimination must be approved by the OHR and US EEOC.

I am aware the OHR and US EEOC protect my right to file a Charge of Discrimination.

I am aware it is unlawful for me to be threatened, intimidated, or harassed because I have filed a Charge of Discrimination as provided by the United States Civil Rights Act of 1964, as amended.

I am aware it is unlawful for me to be threatened, intimidated, or harassed because I have filed a charge of discrimination as provided by the DC Human Rights Act of 1977, as amended.  Each agency will review this withdrawal form and take the appropriate action regarding the Charge of Discrimination.

I have not been forced, intimidated, coerced, or otherwise influenced to submit this Charge of Discrimination withdrawal form.

I am submitting this Charge of Discrimination withdrawal form because:
I wish to receive a Notice of Right to Sue.

I wish to withdraw the Charge of Discrimination I have filed with the D.C. Office of Human Rights:

| Fabriciana De Soriano | 9/23/2025 |
|---|---|
| **Complainant's Signature** | **Date** |

I wish to withdraw the Charge of Discrimination I have filed with the Equal Employment Opportunity Commission:

| Fabriciana De Soriano | 9/23/2025 | ✔ Please provide a US EEOC Notice of Right to Sue |
|---|---|---|
| **Complainant's Signature** | **Date** | |

| SEND TO: | D.C. Office of Human Rights 441 4th Street, N.W. Suite 570N Washington, D.C. 20001 | EEOC USE ONLY: |
|---|---|---|
| | | ____ Approve ____ Date |
| | | ____ Deny ____ Date |
| | | Director |

OHR WITHDRAWAL 1/1
Revised February 2014

On Sep 23, 2025, at 1:50 PM, EnforcementPurple, OHR (OHR) <ohr.enforcementpurple@dc.gov> wrote:

Dear Ms. Keith,

Thank you for your email.  Please have Ms. De Soriano fill out and return the attached withdrawal request form, signing on both lines and checking the box indicating that she wishes to receive a Notice of Right to Sue.

Sincerely,

Jaime Wojdowski
Enforcement Manager
**OHR Enforcement Unit – Purple Team**

District of Columbia Office of Human Rights
441 4th Street NW, Suite 570N

**From:** EnforcementPurple, OHR (OHR) ohr.enforcementpurple@dc.gov
**Subject:** Re: OHR Complaint No 24-300-P(N)
**Date:** September 24, 2025 at 11:19 AM
**To:** Pamela Keith pamkeith@centerforemploymentjustice.com



Received, thank you.  OHR will process the dismissal of the case.

Sincerely,

Jaime Wojdowski
Enforcement Manager
OHR Enforcement Unit – **Purple Team**

District of Columbia Office of Human Rights
441 4th Street NW, Suite 570N
Washington, DC  20001

Main: 202.727.4559
Fax: 202.727.9589

ohr.dc.gov
facebook.com/DCOHR
twitter.com/dchumanrights
instagram.com/dchumanrights

*OHR will be operating remotely during the public health emergency. For more information on our operating status click here. For the latest news on the District's response to COVID-19, go to coronavirus.dc.gov.*

STATEMENT OF CONFIDENTIALITY:  The information contained in this electronic message and any attachments to it are intended for the exclusive use of the addressees and may contain confidential or privileged information.  If you are not the intended recipient, please notify the sender immediately and destroy all copies of this message and any attachments.

**From:** Pamela Keith <pamkeith@centerforemploymentjustice.com>
**Sent:** Tuesday, September 23, 2025 5:17 PM
**To:** EnforcementPurple, OHR (OHR) <ohr.enforcementpurple@dc.gov>
**Subject:** Re: OHR Complaint No 24-300-P(N)

CAUTION: This email originated from outside of the DC Government. Do not click on links or open attachments unless you recognize the sender and know that the content is safe. If you believe that this email is suspicious, please forward to phishing@dc.gov for additional analysis by OCTO Security Operations Center (SOC).

Washington, DC  20001

Main: 202.727.4559
Fax: 202.727.9589

ohr.dc.gov
facebook.com/DCOHR
twitter.com/dchumanrights
instagram.com/dchumanrights

*OHR will be operating remotely during the public health emergency. For more information on our operating status click here. For the latest news on the District's response to COVID-19, go to coronavirus.dc.gov.*

STATEMENT OF CONFIDENTIALITY:  The information contained in this electronic message and any attachments to it are intended for the exclusive use of the addressees and may contain confidential or privileged information.  If you are not the intended recipient, please notify the sender immediately and destroy all copies of this message and any attachments.

---

**From:** Pamela Keith <pamkeith@centerforemploymentjustice.com>
**Sent:** Wednesday, September 17, 2025 11:45 AM
**To:** EnforcementPurple, OHR (OHR) <ohr.enforcementpurple@dc.gov>
**Cc:** Fabriciana De Soriano <fabricianadesoriano@gmail.com>
**Subject:** Fwd: OHR Complaint No 24-300-P(N)

CAUTION: This email originated from outside of the DC Government. Do not click on links or open attachments unless you recognize the sender and know that the content is safe. If you believe that this email is suspicious, please forward to phishing@dc.gov for additional analysis by OCTO Security Operations Center (SOC).

<OHR.Complainant.Withdrawal-EEOC Crossfiled.pdf>

# EXHIBIT 5

# Exeter Police Department
## Incident Report

Page: 1

08/20/2021

**Incident #: 21-231-OF**
**Call #: 21-3586**

```
Date/Time Reported: 03/23/2021 1046
  Report Date/Time: 03/23/2021 1050
  Occurred Between: 03/05/2020 0000-03/06/2020 2359
            Status: Incident Open

          Involves: Sex Crimes, Juveniles
 Reporting Officer: Detective Sergeant Justin Ranauro
```

Signature: _____

| # | SUSPECT(S) | SEX | RACE | AGE | SSN | PHONE |
|---|-----------|-----|------|-----|-----|-------|
| 1 | ███████████  ████████  ██████████ | ▉ | ▉ | ▉ | ████████ | ████████ |

```
Military Active Duty: N
            BODY: NOT AVAIL.              COMPLEXION: NOT AVAIL.
             DOB: ████████          PLACE OF BIRTH: NOT AVAIL.
  LICENSE NUMBER: ████████████           ETHNICITY: NOT HISPANIC
```

_____[CONTACT INFORMATION]_____

Home Phone        (Primary)        ████████████

| ALIAS LAST NAME | FIRST NAME | MIDDLE NAME | SSN | DOB |
|-----------------|-----------|-------------|-----|-----|
| ████████ | █ | | ████████ | ████████ |

| # | OFFENSE(S) | ATTEMPTED | TYPE | CLASS |
|---|-----------|-----------|------|-------|

LOCATION TYPE: School-Elementary/Secondary    Zone: Downtown zone
PEA-JEREMIAH SMITH HALL
20 MAIN ST
EXETER NH 03833

| 1 | **FELONIOUS SEXUAL ASSAULT - FORCIBLE FONDLING** | N | Felony | B |
|---|---|---|---|---|
| | 632-A      3      3      B | | | |

WEAPON/FORCED USED: Personal Weapons (Hands/Feet/Etc)

| 2 | **SIMPLE ASSAULT** | N | Misdemeanor | B |
|---|---|---|---|---|
| | 631      2-A      B | | | |

WEAPON/FORCED USED: Personal Weapons (Hands/Feet/Etc)

**Exeter Police Department**
**Incident Report**

Page: 2
08/20/2021

Incident #: 21-231-OF
Call #: 21-3586

| # | VICTIM(S) | | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|---|---|
| 1 | D█ S█████, F██████ ████████ | | F | W | 16 | NOT AVAIL | ██████ █ |

DOB: ████████
INJURIES: None
ETHNICITY: Not of Hispanic Origin
RESIDENT STATUS: Non Resident
VICTIM CONNECTED TO OFFENSE NUMBER(S): 1   2
RELATION TO: ████████████████████     Acquaintance
CONTACT INFORMATION:
Home Phone         (Primary)         ████████

| # | PERSON(S) | PERSON TYPE | SEX | RACE | AGE | SSN | PHONE |
|---|---|---|---|---|---|---|---|
| 1 | MURPHY, MEREDITH | PARENT | F | U | 43 | NOT AVAIL | ████████ |

CONTACT INFORMATION:
Home Phone         (Primary)         ████████

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2 | SORIANO, ERNESTO | PARENT | M | U | 61 | NOT AVAIL | ████████ |

CONTACT INFORMATION:
Home Phone         (Primary)         ████████

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 3 | DAMON, CARLENE | PARENT | F | W | 52 | NOT AVAIL | ████████ |

CONTACT INFORMATION:
Home Phone         (Primary)         ████████

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 4 | D████, M█ | WITNESS | F | U | 16 | NOT AVAIL | |

EMPLOYER: PEA STUDENT

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 5 | CONNELLY, PATRICK | PARENT | M | W | 56 | NOT AVAIL | ████████ |
| 6 | C████████ M██ | WITNESS | M | W | 15 | NOT AVAIL | ████████ |

**Exeter Police Department**
**Incident Report**

Incident #: 21-231-OF
Call #: 21-3586

| # | OTHER PROPERTIES | PROPERTY # | STATUS |
|---|---|---|---|

**1**  CAC INTERVIEW PORTSMOUTH CAC                 21-128-PR            Evidence (Not Nibrs Reportable)
QUANTITY: 1                     VALUE: $1.00
SERIAL #: NOT AVAIL
    DATE: 04/05/2021
   OWNER: █████████████████

**2**  BROOKLYN CAC WITH F███████                  21-213-PR            Evidence (Not Nibrs Reportable)
QUANTITY: 1                     VALUE: $1.00
SERIAL #: NOT AVAIL
    DATE: 06/14/2021
   OWNER: ██████████, F█████████

**3**  2ND CAC INTERVIEW W/ F████████ BROOKLYN  21-342-PR            Evidence (Not Nibrs Reportable)
QUANTITY: 1                     VALUE: $1.00
SERIAL #: NOT AVAIL
    DATE: 07/20/2021
   OWNER: D█ S███████, F█████████

**Exeter Police Department**

NARRATIVE FOR SERGEANT JUSTIN A RANAURO

Ref: **21-231-OF**

3. After reading through the report, I reached out to F█████'s mother and father:

**Meredith Murphy**

**Ernesto Soriano**

I asked them if they would be willing to come back to New Hampshire to have F█████'s re-interviewed at the Rockingham County CAC and they asked if they could discuss it and get back to me. I advised that was okay and to let me know. I later heard back from Ernesto and he advised me that they could be in New Hampshire on April 2nd, 2021. I contact the Rockingham County CAC and set up an interview for April 2nd, 2021 at 0900 hours. I contact Ernesto and advised him of this and he stated that this date and time was okay.

Exeter Police Department
NARRATIVE FOR SERGEANT JUSTIN A RANAURO
Ref: 21-231-OF

4. Case open pending CAC interview.

**Exeter Police Department**
SUPPLEMENTAL NARRATIVE #1 FOR DET. SGT. JUSTIN RANAURO
Ref: 21-231-OF

**04/05/2021**
**Det. Sgt. Justin Ranauro**
**21-231-OF**
**Supplemental #1**

1. On April 2nd, 2021 at approximately 0900 hours, I attended a CAC interview for ▆▆▆▆ Also present during this interview was ACA Melissa Fales. Before the interview started, we met with ▆▆▆▆s parents. Her mother advised me that on April 1st, 2021 ▆▆▆▆ disclosed to her that ▆▆▆▆▆▆ had "Digitally penetrated" ▆▆▆▆ during the incident that she was at the CAC to talk about. Additionally, ACA Fales located a medical release for ▆▆▆▆'s Doctor and it was provided to her mother in order for us to obtain medical records. During the interview ▆▆▆▆ stated in part:

-She came to talk about two main incidents
-The first incident happened with an adult by the name of ▆▆▆▆▆▆▆▆▆▆▆▆
-She was asked to go to her office as a follow up to the day before
▆▆▆▆ touched her in a way that she felt uncomfortable with
-Prior to the contact, she had been crying and ▆▆▆ asked her if she wanted a hug
-She did not say yes, but did nod her head
▆▆▆▆ gave her a hug and ▆▆▆ was petting her hair
▆▆▆▆ then started to kiss the top of her head which made her feel really uncomfortable
-When ▆▆▆ was hugging her, ▆▆▆s hands went from her lower back to the top of her "butt "and then her hands came up the sides of her back and up to the sides of her chest and stayed there for a few seconds
▆▆▆▆ then moved her right hand down and made contact with her vagina
-She was menstruating during this
-This happened on a Friday
-On March 5th, 2020 she was at meeting for Crew Team
-It was about 1600-1630 and she got a phone call on her phone from her parents
-They told her that she had to go to her room and then go to the Dean's Office to meet with one Dean and ▆▆▆
-Her dad did not want her talking to the Police or signing anything
-There was a jacket that was given to her that she had to take back to the Dean's Office because she had found out it had been stolen
-She went into ▆▆▆'s office and then the questioning started
-The questioning went from approximately 1630-1950 hours
-She does not remember exactly what questions were asked, but remembers exactly how the room was set up
-She remembers that ▆▆▆ said that "Your people have a hard time telling the truth"
-She said that she felt like she was being set up
▆▆▆▆ made her type out a written statement on her personal computer
-She said that someone had given her the jacket
-She was scared of who gave her the jacket so she didn't want to say their name
-There was also a sweatshirt involved that she found on a table for lost items
-She had been confronted on this already
-She was not up front about what happened with the sweatshirt because she was scared of retaliation
-She told the ▆▆▆ that she hopes whoever stole the jacket gets what they did
-The following day, she did not have any exams
-On the day this happened, she was wearing a pair of shorts and a tank top

-She got an email from the Dean to come back as a follow up
-She was there from about 1000-1230 hours for more questioning
-She does not remember everything said
-She was sobbing in ███████'s office
-She thought the sweatshirt was a free item
-She was really confused when the jacket was given to her
███████ asked her if she wanted a hug
-After what was previously mentioned happened, ███████ said that if you do what I did to you, you won't have to worry about the charges
-She had said she would literally do anything during the conversation, but she meant things like community service etc.
-She did not mean anything sexual
-She told ███████ "Hell no"
███████ said it's not even worth it anyways
-Campus is in Exeter at Phillips Exeter Academy
-The emails were sent through school emails
-On the Friday that she went back, ███████ ensured that she did not have a phone
-When ███████ hugged her, ███████'s body was facing her and she was pressing her body to hers
-There was rubbing with the front of her body against her and her body was parallel to hers
-She was sitting when ███████ asked her if she wanted a hug
-When ███████ hugged her, she was standing
-She does not remember where ███████'s hands were at the beginning, but at some point, her hands grazed down and touched her lower back
███████'s hand touched her upper buttocks around her hips
-This happened over clothing
███████ then touched the side of her breast
███████'s body was still on hers when this happened
-She just wanted to get out of the office
███████ did not say anything when she was touching the side of her breast
-When ███████ touched her vagina, it did not do so from the top of her shorts
-Due to her shorts being loose, ███████ brought her hand from the bottom
-She could feel her finger by the front of her body
-Meaning the front part of her vagina
-Her finger was in between the opening
-She would say it came from the front and up a little bit
-She did not feel it in any canal
-She did feel it between her "lips"
███████'s finger was touching skin to skin
███████ did it quickly but was not saying anything
-She completely pushed away from her and felt disgusting
-After this happened, ███████ said "You know that thing I did to you" and then she offered to reciprocate it (Meaning ███████ wanted R███████ to reciprocate what was done)
-She told ███████ no and then asked her to talk to her parents
███████ told her that her parents were not going to buy it
-When she told ███████ no, she looked upset

SUPPLEMENTAL NARRATIVE #1 FOR DET. SGT. JUSTIN RANAURO
Ref: 21-231-OF

-She is pretty sure that the door to ███████'s office is all wood
-The door was shut when this was going on
-She does not think there was anyone in the facility
-She has only told her parents about this much detail
-She told the following friends, but did not go into as much detail:

M████ C██████
M████ D██████
C██████ M████

-She also told a social work (Maria) at the CAC in New York, but she did not let her know about the penetration from ████████
-She has wanted to talk about this all along, but she was worried about her parent's reaction
-Both of her parents helped her prepare for this interview
-She has also spoken to two doctors at the adolescent center in New York
-It wasn't really like this is what you're going to say and this is how you're going to say it
-Her mom and dad helped her by praying a lot
-They let her know they would be there the entire time
-Nobody talked to her about what she should say
-There is nothing else that she wants to share regarding ███████
-There is a lot more that she wants to talk about regarding the ████████ but nothing pertaining to this case

For the full interview regarding the incident with ███████, please see the interview that was entered into evidence.

2. F████████ spoke about an incident involving a student that had already been reported to EPD (See 20-383-OF). I ran F████████ through IMC and noticed that in January 2020, she was a suspect in a Theft of a jacket. The case was not pursued as the jacket had been returned to the owner. Based on the facts of this case, it would appear that this is the incident that ████████████ wanted to speak to F████████ about when this incident occurred.

3. In the upcoming shifts, I will be attempting to speak to F████████'s friends and I will attmept to obtain the medical records from her Doctor in New York and P.E.A. It should be noted that ████████████ has already been interviewed regarding this incident. This is documented in 20-383-OF. However, ████████████ has not been interviewed regarding touching F████████'s vagina. I will also attempt to re-interview ████████████ regarding the new allegation.

4. Case open.

Exeter Police Department
SUPPLEMENTAL NARRATIVE #10 FOR DET. SGT. JUSTIN RANAURO
Ref: 21-231-OF

Page: 1

**06/14/2021**
**Det. Sgt. Justin Ranauro**
**21-231-OF**
**Supplemental #10**

1. On June 14th, 2021 I heard from Justin Merrill regarding completing an interview with ▇▇▇▇▇. He advised me that I could not speak to ▇▇▇▇▇ regarding this case.

2. Case open.

Exeter Police Department

Page: 1

SUPPLEMENTAL NARRATIVE #11 FOR DET. SGT. JUSTIN RANAURO

Ref: 21-231-OF

06/24/2021
Det. Sgt. Justin Ranauro
21-231-OF
Supplemental #11

1. On June 22nd, 2021 I spoke with Meredith and Ernest on the phone regarding ██████. I was advised that on June 18th, 2021 ██████ had spoken to them about the incident with ██████████. ██ told Meredith that when ██████████ touched her genitals, she put her fingers in the shape of a "W" and then made a curling motion with her fingers. Meredith advised me that when she said she made a curling motion with her fingers, she meant that ██████████ fingers were inside of ██████s vagina. Meredith advised me that ██████████ wanted ██████ to do the same thing to her and believes that ██████ was kicked out of PEA because she did not comply.

2. Meredith further advised me that when ██████ met with Dean Atif on the Thursday, she signed a statement and when ██████████ met with her on that Friday, she never presented ██████ with a statement, but instead presented her with a sexual request. Meredith advised me that when ██████████ presented this to ██████, she ran out of the office. Meredith further advised that ██████████ refused to make a phone call to ██████s parents. Meredith further explained that before ██████ was called to the office, ██████████ called them and spoke to them in an angry tone and accused ██████ of stealing the jacket. Meredith advised me that Dean Atif was on the call as well and that Meredith hung up on her.

3. Meredith further explained that on September 9th, 2020 ██████████ was overseeing the discipline in this matter. Laura Marshall and Karen Lassy were re-assigned to the case. Laura told ██████ that she had no remorse or conscious because she did not apologize to ██████████ and that was why she was being asked to leave the school. Meredith advised me that it was around this time that ██████ started to make allegations. Meredith and Ernesto advised me that they thought that this was a conspiracy against ██████ and their family.

4. Case open.

Exeter Police Department    Page: 1
SUPPLEMENTAL NARRATIVE #12 FOR DET. SGT. JUSTIN RANAURO
Ref: 21-231-OF

**06/24/2021**
**Det. Sgt. Justin Ranauro**
**21-231-OF**
**Supplemental #12**

1. On June 24th, 2021 I spoke with Meredith and Ernesto on the phone. They advised me that F▮▮▮▮▮▮▮ has an OBGYN appointment on July 18th, 2021 with Dr. Faith Okuesi and also a clinical social worker Laura Sinkman. Additionally, they advised me that there is an Expert Witness in Child Sexual Abuse that is now involved in this case. They identified him as Daniel Pollack.

2. Case open.

**Exeter Police Department**

SUPPLEMENTAL NARRATIVE #13 FOR DET. SGT. JUSTIN RANAURO

Ref: 21-231-OF

07/07/2021
**Det. Sgt. Justin Ranauro**
**21-231-OF**
**Supplemental #13**

1. On June 30th, 2021 I spoke with Meredith and Ernesto on the phone in regards to new information that F█████ had disclosed to them. During this conversation, I was advised that they had hired a Victim/Witness Advocate from the Troutman Pepper Law Firm in Boston, Massachusetts. The advocate's name is Miranda Hooker (617-204-5160).

2. I was also advised that on June 29th, 2021, F█████ disclosed that when ████████████ put her hands up the front part of F███████'s shorts (Meaning vagina), ████████████ then put her hand on the back of F████████'s head and face and pulled her in and kissed her with her tongue. At this point, F████████ pulled back and ████ ████████called her "My dirty little slut". F█████████ was upset and asked to contact her parents and █████████ told her that she did not think that her parents were going to buy it. F████████ told them that after this happened, she left. Meredith advised me that she had been calling F█████ non-stop during this meeting and had a parent instinct that something was not right.

3. Based on this information, I asked them if they wished to have F███████ interviewed again at the Brooklyn CAC and I was advised that they wanted to think about and let me know.

4. Case open.

**Exeter Police Department**

SUPPLEMENTAL NARRATIVE #14 FOR DET. SGT. JUSTIN RANAURO

Ref: 21-231-OF

**07/07/2021**
**Det. Sgt. Justin Ranauro**
**21-231-OF**
**Supplemental #14**

1. On July 6th, 2021 I heard from Ernesto regarding the CAC interview and he advised me that they did wish to have F███████ interviewed again at the CAC. I then contacted Aisha Marbarak from the Brooklyn CAC and asked her to schedule and interview and she advised me that she would send me the zoom link to be able to watch the interview.

2. On July 7th, 2021 I reached out to Daniela Connelly (Mother of M████ C██████) in order to try and set up an interview with M███ I was unable to reach her so I left a message and I am waiting for her to call me back.

3. Case open.

Exeter Police Department

Page: 1

SUPPLEMENTAL NARRATIVE #15 FOR DET. SGT. JUSTIN RANAURO

Ref: 21-231-OF

07/15/2021
Det. Sgt. Justin Ranauro
21-231-OF
Supplemental #15

1. On July 15th, 2021 I watched a CAC interview with ▮▮▮▮ via Zoom. This CAC was completed in Brooklyn, New York by Aisha Marbarak. During the interview, ▮▮▮▮ stated in part that:

-She has new information
-The one time in January when the student came into her room and pulled out a blade they said there were other people that would hurt her
-The student involved in this was ▮▮
-They also said that there were other people involved in this and that she would see
-Regarding the time she was in the Dean's Office on Friday ▮▮▮▮ put two fingers inside her body and curled her fingers
-▮▮▮▮ put her hand on the back of her head and kissed her and put her tongue in her mouth
-When ▮▮▮▮ put her fingers inside of ▮▮▮▮ she put them inside of her genitals
-She is pretty sure ▮▮▮▮ used her rand hand
-When she put her hand on the back of her head, she does not know which hand ▮▮▮▮ used
-▮▮▮▮ said "My dirty little slut" to her
-▮▮▮▮ she is referring to is ▮▮▮▮
-Nobody else was there when this happened and she was in ▮▮▮▮ office
-When this happened it was so uncomfortable that she suppressed it
-There are certain parts that are so uncomfortable that she has either subconsciously or purposely tried to suppress the memories
-She is trying to actively not think about this and it is probably why she did not bring it up sooner
-There is nothing else that she thinks she should report

I requested a copy of this interview to be mailed to me via Certified mail and Aisha agreed to send it. Once I receive it, I will enter it into evidence.

2. Case open.

Exeter Police Department                                                         Page: 1
SUPPLEMENTAL NARRATIVE #16 FOR DET. SGT. JUSTIN RANAURO
Ref: 21-231-OF

**07/20/2021**
**Det. Sgt. Justin Ranauro**
**21-231-OF**
**Supplemental #16**

1. On July 19th, 2021 I received the CAC interview from Brooklyn, New York. I have entered this item into evidence.

2. Case open.

**Exeter Police Department**
SUPPLEMENTAL NARRATIVE #17 FOR DET. SGT. JUSTIN RANAURO
Ref: 21-231-OF

**07/26/2021**
**Det. Sgt. Justin Ranauro**
**21-231-OF**
**Supplemental #17**

1. On July 26th, 2021 I received a narrative from Sgt. Hanna. In the narrative it states that Meredith had contacted EPD and spoke with him regarding this case. It was reported that F███████ has been in distress and that after her recent CAC, she disclosed that a student:

███████████████████

had told M████ D████ in the hallway that "That bitch should kill herself or I'll do it myself". F███████ heard this and thought that it was about her. Meredith went on to stated that at one point, S██████ had pulled a razor blade on F███████ in a dorm room **(See Sgt. Hanna's narrative).**

2. I tried to contact Meredith, but she did not answer. I left a message and I am waiting for her call back.

3. Case open.

**Exeter Police Department**
SUPPLEMENTAL NARRATIVE #18 FOR DET. SGT. JUSTIN RANAURO
Ref: 21-231-OF

Page: 1

**07/28/2021**
**Det. Sgt. Justin Ranauro**
**21-231-OF**
**Supplemental #18**

1. On July 28th, 2021 I spoke with Meredith and Ernesto on the phone and was advised that ███████ did not actually pull a razor blade and ██████████ was actually the one who pulled the blade. Meredith and Ernesto were concerned with the statements that were made from ████████ that F██████ overheard.

2. Case open.

Exeter Police Department                                                    Page: 1
SUPPLEMENTAL NARRATIVE #19 FOR DET. SGT. JUSTIN RANAURO
Ref: 21-231-OF

08/05/2021
Det. Sgt. Justin Ranauro
21-231-OF
Supplemental #19

1. On August 3rd, 2021 I spoke with Meredith and Ernesto regarding new information regarding this case. They informed me that they have been having a continuous conversation with F███████ regarding her property that she left at PEA. I was advised that in April of 2020 Dean Moriarty sent an email regarding students having property on Campus but could not come to the campus due to the pandemic. I was told that students could have filled out a form to get their property. F███████ filled the form out and sent it back. By June of 2020 her items had not arrived. An email was then sent to PEA (Lea Rollock) and as a result of this, Lea went to F███████'s dorm and did not see the box in question and there was not tracking information for the box. I asked them what was in this box and I was told the following items were located in the box:

**Mail from box # 1296**
**Hair products and shower caddy: Approximately $70.00**
**Zara Boots: Approximately $100.00**
**Doc Martin Shoes: Approximately $200.00**
**Urban Outfitters Sandals: Approximately $60.00**
**Dansco Clogs: Approximately $145.00**
**Makeup: Approximately $100.00**
**Socks: Approximately $20.00**

**Total: $695.00**

I was advised the Lea confirmed with Mrs. Dean that it was packed up, but there was no tracking number associated with it and that it could be in the athletic facility. I asked which dorm F███████ lived in and I was told that she lived in Merrill Hall room #428. I was advised that F███████ had received all of her other items with the exception of the aforementioned items. I was also told that PEA gave them a total of 6 hours to get her belongings from PEA or they would be disposed of. I asked when this happened and I was told in October of 2020.

2. I was told that the family had to contact a lawyer and have that lawyer contact PEA to get her items back. All but the items listed arrived on 10/29/20. Meredith advised me that she finds it odd that those items are still missing and that it's odd that ███████████ had access to the dorm rooms. I later received an email from Meredith stating that they filed a report with NYPD regarding the theft.

3. Case open.

**Exeter Police Department**                          Page: 1
SUPPLEMENTAL NARRATIVE #2 FOR DET. SGT. JUSTIN RANAURO
Ref: 21-231-OF

**04/07/2021**
**Det. Sgt. Justin Ranauro**
**21-231-OF**
**Supplemental #2**

1. On April 7th, 2021 I contacted Meredith regarding the medical records from ████████'s Doctor in New York. I spoke to both Meredith and Ernesto and was advised that they would drop the medical release off at the Doctor's. I also advised them that I would send them a release so that I could obtain any medical records from P.E.A. I sent this to Ernesto on April 7th, 2021 via email.

2. Case open.

Exeter Police Department                                    Page: 1
SUPPLEMENTAL NARRATIVE #20 FOR DET. SGT. JUSTIN RANAURO
Ref: 21-231-OF

**08/05/2021**
**Det. Sgt. Justin Ranauro**
**21-231-OF**
**Supplemental #20**

2. Case open.

**Exeter Police Department**                                    Page: 1
SUPPLEMENTAL NARRATIVE #21 FOR DET. SGT. JUSTIN RANAURO
Ref: 21-231-OF

08/06/2021
Det. Sgt. Justin Ranauro
21-231-OF
Supplemental #21

1. On August 6th, 2021 at approximately 0930 hours, I went to ████████████████████ to meet with:

**Patrick Connelly**
████████████
**&**
**M███**
**(Age 15)**

in regards to information that M███ may have pertaining to this case. I obtained permission from Patrick to speak to M███ and completed two audio-recorded interviews. During the interviews, M███ stated in part that:

-He does recall having conversations with F█████ regarding incidents that occurred at PEA
-He had conversations with her in September of 2020
-F█████ talked to him about what had happened
-He cannot remember much and she was hysterically crying while she was talking to him
-At the same time she was discussing this, she had told him that she was kicked out of school
-All he knows is that there was a teacher involved
-He cannot remember what kind of teacher (Physics or science)
-He had groped her or he had done something multiple times, but he is not really sure
-F█████ told him that she was groped or sexually assaulted by a teacher multiple times at PEA
-F█████ did not explain what happened
-He did not get specifics of what happened, but he knew it was bad because she was crying
-The conversation took place over the phone
-The way he understood the circumstances surrounding her being kicked out of school was that the school was mad about her allegations and kicked her out
-He later found out that it was because she had broken school rules and stole
-He learned this from other people
-It was the rumor going around from the "Merrill girls"
-He does not think that F█████ mentioned the teacher's name
-He thinks that it was a male teacher
-F█████ was using male pronouns
-F█████a did not describe the exact specifics about what happened
-He does not think that F█████ used the words sexual assault
-He does not know what words F█████ used
-When she described the story that is what he took from it
-The specifics of what she said, that he can remember, is that he touched her
-She did use the word he
-F█████a did not specify where she was touched
-F█████a did not specifically say when this happened
-When F█████ said that he touched her, he thinks that is why he assumes that she was sexually assaulted

**Exeter Police Department**
SUPPLEMENTAL NARRATIVE #21 FOR DET. SGT. JUSTIN RANAURO
Ref: 21-231-OF

-F█████ did not say if she told anyone else
-As far as F█████ being kicked out of PEA, she said that she got kicked out
-F█████ said that she was mad at the Dean's
-He is not sure for what reason
-The Dean's that he is talking about are Dean Cahalane and an unknown male Dean (Not Dean Coole)
-F█████ mentioned Dean Chalane's name
-The conversation regarding █████████ was that they were in a room discussing an allegation (F████ did not specify which allegation she was talking to █████████ about)
-The way he understood it was that the Dean's did not believe that she was sexually assaulted or they were dismissive
-F█████ did say that while she was talking to █████████, she (█████████) rubbed her back and she found it uncomfortable
-The way he understood it, F█████ was in a room with █████████ and she was crying and █████████ had come up to her and rubbed her back
-F█████ felt uncomfortable and did not say anything because she was frozen
-F█████ talked to two Dean's including Dean Cahalane
-The male Dean had done something to make her feel uncomfortable
-He does not remember if the touching was in an inappropriate area
-The last time he spoke to F█████ was when he returned to school in late September 2020
-He heard that F█████ had been stealing in Merrill Hall and the "Merrill Girls" set her up by putting an expensive jacket out and waited for her to steal it and Fabriciana stole it
-F█████ had been stealing before, but now they had proof
-This was told to him, but he has not proof of this
-The only thing that F█████ said regarding Dean Cahalane was that she touched her on the back
-With the other Dean, he cannot remember where F█████ was touched
-F█████ was adamant about getting the story out
-F█████ said that she would get the story out because she was mad at the Deans
-She said in effect that the Dean's had it coming and were going to get fired because of the allegations with the teacher and them
-The other Dean touched her but he is not sure where

2. At this point, I stopped the interview. It appeared to me that M███ was withholding information regarding this case. I asked him what was going on and she stated to me that he is worried about retribution from the Dean's at PEA. He stated he has heard stories before that the Dean's have gotten people removed from PEA in the past. I advised M███ that he can report whatever he wants to the Police and his father has given him permission to speak with me. I advised M███ that the school cannot prevent him from reporting anything to the Police. M███ advised that he had more information regarding this case. I confirmed with Patrick that I could continue to speak with M███ and completed the second audio-recording. During this interview, M███ stated that:

-He has information regarding the Dean
-All F█████ told her regarding Dean Cahalane is that Dean Cahalane rubbed her back
-The other Dean had done something worse to F█████
-F█████ said that he might have known her history of being sexually assaulted and used that against her to scare her and take advantage of her
-F█████ told him that the male Dean had touched her in an inappropriate area

Exeter Police Department
Page: 3

SUPPLEMENTAL NARRATIVE #21 FOR DET. SGT. JUSTIN RANAURO
Ref: 21-231-OF

-F█████ reported that he had touched her and slid his hand
-This was not Dean Cahalane
-She said that he had touched her in an inappropriate area
-She did not specify if she was touched in the front or back of her body
-F█████ did not say if this was above or under clothes

For the full interviews, see the attachment to this case.

3. Case open.

Exeter Police Department
### SUPPLEMENTAL NARRATIVE #22 FOR DET. SGT. JUSTIN RANAURO
Ref: **21-231-OF**

08/19/2021
Det. Sgt. Justin Ranauro
21-231-OF
Supplemental #22

1. On August 17th, 2021 I spoke with Meredith and Ernesto on the phone. It should be noted that prior to this conversation, I spoke with them about this case being sent to the County Attorney's Office for review in the near future. During this conversation, Meredith and Ernesto stated in part that:

-They recently watched the Jeffrey Epstein documentary
-Fabriciana took an art class at the Frick Museum
-The Epstein Mansion is behind the Frick Museum
-They have had a lot of conversations with F██████a about predators
-In the Epstein documentary a girl had $300.00 cash on her and her parents asked her where she got the money from

-Her parents pressed her and she ended up disclosing that she was molested
-Fabriciana had $200.00 cash on her and it came from ███████
-They are concerned about sex trafficking at PEA
-They have spoken to a lot of people from around the country (Dr. Stephanie Powell from the National Center of Sex Exploitation, Martina Vandenberg from the Human Trafficking Law Center, Jenna from Safe Horizons) and they all think that sex trafficking is going on at PEA
-They have concerns about retaliation from █████████
-They have these concerns because ██████████ would try to stop and talk to F███████ on multiple occasions after the two original times in her office
-Other students have seen a "violent" and concerning side to ████████
-F██████ has seen ████████ with her daughter at a PEA lunch and her daughter was crying
-They are concerned that there might be an incest relationship between ████████ and her daughter
-Meredith has heard that ████████ is involved with the Jack and Jill Foundation and Meredith thinks that if I called them, it would incite ████ to speak with Law Enforcement regarding this matter (I advised Meredith that I could not legally coerce someone to speak to me)
-There was a petition to William Rawson online to have ████████ fired from PEA
-On August 15th, 2020, M████ D████ and C██████ M████ were messaging F██████ saying things like: Get your asses in, you need to try everything at least once, new rule
-M████ sent screen shots of sexual acts that appeared to fall under BDSM (I advised them that this was also not a criminal act)
-F████████ said that she didn't see the messages and asked M████ and C██████ not to send those to her
-Another juvenile (J████C.) was also sexually assaulted at the school (Investigated by Det. Teixeira)
-There is a thing called the "Harkness Society"
-The "Harkness Society" is where students are encouraged to have sex on the tables
-At one point, ████████ told them that things involving other juveniles was none of their business even though some instances involved F████████
-They received an email from Karen Lossi that if F████████ did not or could not come to the Community Conduct meeting, she would be put on Dean's leave and not expelled from school. However, F████████ was expelled anyhow
-Karen Lossi and Laura Marshall called the house on 9/9/20 to tell them that F████████ would have to withdraw

Exeter Police Department

SUPPLEMENTAL NARRATIVE #22 FOR DET. SGT. JUSTIN RANAURO

Ref: 21-231-OF

from school and they (Meredith and Ernesto) know that it was because █████ did not apologize to ██████
-The call was very hateful
-Meredith typed up a statement (I asked her to email it to me and she agreed, but did not send it)
-There is a sub-culture at PEA
-The Proctors do not have to report things to DCYF
-Boys record girls having sex
-Boys are being anally raped with objects in Soul Hall
-She has seen this on PEA Confessions and this is what triggered the petition
-█████ has been crying in her bed
-They are pin-pointing ██████████████████████████ for collectively assaulting kids or working to cover things up for each other

2. I reviewed Det. Teixeira's report with her interview with ████████ I believe at this time, this case should be forwarded to Rockingham County Attorney's Office for review.

3. Case open pending CA's review.

**Exeter Police Department**

SUPPLEMENTAL NARRATIVE #3 FOR DET. SGT. JUSTIN RANAURO

Ref: 21-231-OF

04/29/2021
Det. Sgt. Justin Ranauro
21-231-OF
Supplemental #3

1. On April 27th, 2021 I spoke with F_____'s parents over the phone and asked them if they have obtained F_____s medical records from PEA or Mount Sanai. I was advised they had not received them, but would contact both places and get them for me. I also asked if they were planning on having F_____ interviewed at the CAC in New York and they advised me that they were and they would let me know the date of the interview. After my conversation with F_____'s parents, I received a call from Holly Barcroft ensuring that the request was legitimate and she advised me that they would get the records out.

2. As of April 29th, 2021 I have not received any medical records regarding F_____, nor have I heard of the CAC date.

3. Case open.

**Exeter Police Department**

SUPPLEMENTAL NARRATIVE #4 FOR DET. SGT. JUSTIN RANAURO

Ref: 21-231-OF

Page: 1

**05/06/2021**
**Det. Sgt. Justin Ranauro**
**21-231-OF**
**Supplemental #4**

1. On May 3rd, 2021 I received the medical records for ▆▆▆▆▆ from Phillips Exeter Academy. I am currently waiting on her CAC in New York and also her medical records from Mount Sanai Hospital. Upon review of her medical records, I noted that:

I will be contacting the Fay School to see what the allegation was.

2. Case open.

Exeter Police Department

Page: 1

SUPPLEMENTAL NARRATIVE #5 FOR DET. SGT. JUSTIN RANAURO

Ref: 21-231-OF

**05/21/2021**
**Det. Sgt. Justin Ranauro**
**21-231-OF**
**Supplemental #5**

1. On May 20th, 2021 I received the medical records from Mount Sanai Hospital in New York and have attached them to this report. In the reports, I noted that ▊▊▊▊ makes the same accusations as she did during the CAC interview in Portsmouth. I noted that the allegations were noted on May 11th, 2021. In these notes, ▊▊▊▊ broke down each incident involving ▊▊▊▊. It should be noted that ▊▊▊▊ was interviewed at the Portsmouth CAC on April 2nd, 2021. I later confirmed with Ernesto that ▊▊▊▊ made the allegation to Mount Sanai after the CAC in Portsmouth. Ernesto also sent me the email exchange between him and the faculty member at the Fay School. I have attached that exchange to this report also. Later in the day I spoke with Merideth who clarified that ▊▊▊▊ actually made the disclosure to Mount Sanai on March 19th, 2021. Meredith agreed to send it to me (See attached).

2. I called the Fay School regarding the incident that was noted in Phillips Exeter's medical records and asked them for ▊▊▊▊'s records. I was told that they would call me back. When I spoke to Ernesto regarding the Fay School on May 21st, 2021, he advised me that the teacher no longer worked there and he was putting inappropriate things on student's doors and making them do things that were uncomfortable. When I heard back from the Fay School (Dianne Byrne), I was advised that the allegations were determined to false and there was a report through Southborough Police Department. Dianne advised me that there were multiple allegations made while ▊▊▊▊ was at Fay School. Dianne advised me that she would send me the reports on Tuesday, May 25th, 2021.

3. I called Southborough MA Police and asked for Detective Keith Nichols (Investigating Officer). I was sent to his voicemail and I am waiting for his call back. When I heard back from him he stated that he would send a copy of his report regarding the allegation. When he did so, I noted that the date of the report was March 12th, 2019 and there were similar reports of an assault by another student and also a faculty member offering hugs for grades. These allegations are similar to the ones made at Phillips Exeter Academy. I have attached his report to this report.

4. Additionally, I spoke to Jenna at the CAC in New York regarding ▊▊▊▊. It was determined that ▊▊▊▊ will be re-interviewed at the CAC in New York. I asked Jenna if she could take ▊▊▊▊ through every event from beginning to end once more and ensure that everything had been covered. I asked her this because ▊▊▊▊ made a new allegation regarding money being exchanged to keep people quiet at Phillips Exeter Academy. I will be made aware of the date of the CAC and I will attend CAC over Zoom and will also get a copy of it once it is completed.

5. Case open.

Exeter Police Department                                    Page: 1

SUPPLEMENTAL NARRATIVE #6 FOR DET. SGT. JUSTIN RANAURO

Ref: 21-231-OF

05/26/2021
Det. Sgt Justin Ranauro
21-231-OF
Supplemental #6

1. On May 25th, 2021 I received the records from the Fay School. While reading through them, I noted that there were similar allegations made at the Fay School regarding inaprorpriate hugging by a Dean and a physical assault by another student. The documents from the Fay School have been attached to this report.

2. Case open pending a CAC in New York. I spoke to Jenna from the CAC in NY and was advised that no date had been set up for the interivew.

Exeter Police Department                                    Page: 1
SUPPLEMENTAL NARRATIVE #7 FOR DET. SGT. JUSTIN RANAURO
Ref: 21-231-OF

**06/08/2021**
**Det. Sgt. Justin Ranauro**
**21-231-OF**
**Supplemental #7**

1. On June 3rd, 2021 I watched a CAC interview with ▮▮▮▮▮▮. This CAC interview was completed in New York. During the interview, ▮▮▮▮▮ stated in part that:

-There was $200.00 in the pocket of the jacket that she returned
-She put the money in the top drawer of her desk
-She did not want to ask about the money
-A student asked her if she liked the gift and if she wanted more money
-She was told to keep her mouth shut or her head would be blown off
-In the meeting with ▮▮▮▮▮, she was asked if she found anything in the pocket of the jacket
-She asked ▮▮▮▮ what she meant and ▮▮▮▮ said never mind
-Nobody has paid her for anything or offered her money for any reason
-She used the money for snacks
-She told K▮▮▮ M▮▮, M▮▮ D▮▮, M▮ C▮▮▮

This is only a brief synopsis of the interview. I requested that it be sent to me certified mail. When I received it on June 8th, 2021 I tried to view it, but there was nothing on the disk. I contacted the CAC in New York and left a message. I am waiting for their call back. Once this happens, I will request a second copy and enter it into evidence.

2. Case open.

**Exeter Police Department**
SUPPLEMENTAL NARRATIVE #8 FOR DET. SGT. JUSTIN RANAURO
Ref: 21-231-OF

**06/09/2021**
**Det. Sgt. Justin Ranauro**
**21-231-OF**
**Supplemental #8**

1. On June 8th, 2021 I spoke with the parents of the following PEA Students regarding this case:

**Justin Merrill**
**(Father of C███████ M████**

**Patrick Connelly**
**(Father of M████ C███████**

**Carlene Damon**
**(Mother of M████ D█████)**

Carlene and Patrick advised me that I could speak with their child. I scheduled an appointment for a phone interview with M████ on June 10th, 2021 at 1500 hours. Patrick advised me that I could speak with M████ but he recently had surgery and would like to wait to speak to me. Justin advised me that he had to talk to his wife, but it did not appear that he wanted me to speak with C███████ regarding this incident.

2. Case open.

Exeter Police Department                                          Page: 1
SUPPLEMENTAL NARRATIVE #9 FOR DET. SGT. JUSTIN RANAURO
Ref: 21-231-OF

---

**06/10/2021**
**Det. Sgt. Justin Ranauro**
**21-231-OF**
**Supplemental #9**

1. On June 9th, 2021 at approximately 1500 hours, I spoke to:

**Carlene Damon**

██████████████

**&**

M███████ **D.**
**(Age 16)**

in regards to the incidents involving F█████ at PEA. I obtained permission from Carlene to speak to M████.
During an audio-recorded interview with M████ she stated in part that:

-She knew F██████ a lot
-F██████ talked about issues going on at the school several times
-Regarding the entire year of 2020 she had some issues with students
-She disliked certain people
-F█████ and ████████ did not get along nor did they really talk
-█ was never near their floor or room and █ stayed away from F██████ because she though F███████ was bad news
-She was around F█████ every day and F███████ never told her or saw her go to the health center
-F██████ never told her about any assault nor did she any bruises on F████████
-F██████ didn't tell her about any assaults until the summer
-She thinks that this is something that F██████ would have told her about
-F██████ never indicated fear of █
-F██████ though █ did not like her
-F██████ told her during the end of the summer (after she had been expelled from PEA) that she was assaulted
-F███████ had a big problem with lying
-She and C██████ M████ had called F███████ regarding being expelled and F███████ started telling them different stories
-These stories included 4 sexual assaults against █ and two teachers, but she cannot remember the last one
-This made her upset at F██████ because that was such a serious matter
-She accused a straight female, 60 year old, higher up faculty member in addition to all the other accusations
-During the phone call, Meredith (F███████'s mother) began answering questions about F███████ being sexually groomed by ████████████
-C██████ M███ is very close with ████████████ and C████ was very "weirded out" by this assault charge
-F██████ also mentioned that █hated her so much that at one point she pushed F██████ and then █ kicked her while she was on the ground
-F████████ stated that she had been kicked so hard and was coughing up blood so she went to the health center
-F████████ stated that the she was informed in the health center that if she had been kicked any lower she would have died (*I checked her medical records again from PEA following this interview and noted that F████████ did report being kicked in the back, but I could not find any notes from the medical center indicating coughing up blood*

*or if she was kicked any lower she would have died)*

-That was exactly what F████ told them. She explained that she had been kicked by █ outside of Merrill Hall on the grass and that she was coughing up blood and that she went to the Health Center

-She never saw any bruising nor did she bring this up during the time frame that this happened

-She thinks that F████ had already gotten into trouble for stealing

-She said there were sexual assaults by ██████, █ and another faculty member who had been charged with sexual assault

-She cannot remember the fourth person who had sexually assaulted F████

-In regards to ██████, F████ told her that she was invited to ██████ office before leaving campus for break

-F████ was in a rush and when she got to ██████ office, ██████ accused her of stealing and was rude or aggressive

-F████ was scared that she was going to miss her bus, so she started crying and ██████ gave her a hug and patted her on the head

-She doubt that ██████ would touch a student without permission

-Either ██████ asked and F████ consented or ██████ just did it anyways

-Meredith said that F████ was being groomed for sexual assault

-As they went on with the hours of conversation, it became more "shaky"

-There were two versions of this story: The first story was that it was consensual and the second was that it was not consensual

-In regards to █, F████ told her that she went to █s room and was talking and █ turned around and went to her room and █ followed her and █ sexually assaulted her by groping her vaginal area and then █ ran off

-That is what F████ told her

-She had asked F████a about this again later and F████ told her that █had gone all the into her room

-One story was in the hallway and one was in the room

-F████ is not credible

-She had been her friend for three trimesters and because she had been around her dealing with other people

-F████ was not really truthful with her parents either

-F████s mother thought that she was very truthful

-They would be at the store at like 8 or 9 at night and F████ would fake yawn and pretend like she was sleeping instead of being out

-Her mother would ask her if she picked things up and she would go through with a lie about taking a nap and would go back to watching Netflix etc.

-This is when she noticed that F████ has no problem with lying

-Then she started to noticed that F████ would do this with friends

-F████ was on FaceTime with a guy that she (M████) had asked out without her knowing

-F████ told the person that M████ was dangerous and she had no idea this happened

-At the end of the summer, she asked this person why he avoided her and he told her that F████ was going to hurt her if he talked to her

-All of these accusations started from the jacket incident

-There were several dorm meetings regarding the jacket

-She had later found out that F████ had been expelled from school for stealing the jacket

-She had actually seen F████ walking around with the jacket on

-She found out through a faculty member that F████ had stolen the jacket

-F████ had a history of stealing

-F███████ changed her story three times during the phone call
-The first story was that she had been given the jacket by ██ and █ threatened her life and said that she (██) would hurt her
-F███████ said that this happened in a common room during a meeting regarding the jacket
-F███████ then wore the jacket all the time and said it was hers
-Later the story changed to T███████ (sp?) being involved
-There was no reports of F███████ stealing money
-F███████ never told her anything about anyone offering her money to be quiet
-F███████ would take people's things and not give them back
-F███████ took her hair straightener and earrings once and would not give them back
-She eventually went into F███████'s room and took her items back
-F███████ has stolen a sweatshirt before and possibly gift cards
-She did not witness any of this, but this is what F███████ told her
-She has direct involvement with her parents
-One time they were on a group chat with F███████ and other friends and a gay bar was mentioned
-F███████a's mother had direct access to F███████'s text messages and she took away F███████s phone because of that text message
-F███████'s mother started to respond as if she was F███████
-She knows this because C███████ called her and told her not to offend her mother
-F███████ also confirmed that her mother was talking to her
-Her interpretation of what happened while F███████ was at PEA is that F███████ borrowed or took the jacket and then got in trouble for it and then decided to involve whoever she could involve to blame
-F███████ had to come up with something so that her mother would be on her side
-As the story got more investigated her parents pressured into taking action and doing things against the original story
-F███████'s mother said that she was going to sue the school for the behavior with ███████████
-She heard this possibly a week after F███████ had been expelled in 2020
-She thinks that F███████ slowly spiraled into more and more deep things and got her parents involved and as people found errors in her story, she changed the story and made it more aggressive and involved things to hit home
-That is how F███████ functioned
-If she ever caught F███████ in lies, she would add additional information to make it worse
-F███████ never admitted to stealing the jacket
-After the phone call, she texted F███████ about things that didn't make sense regarding the allegation against ███████████
-There was a sexual assault case at PEA that F███████ witness
-F███████ was told not to discuss the assault with anyone, but she did anyways against school rules
-Her mother got involved in this too and spoke with the victim and told her it was okay
-F███████ had left her other school as a result of a sexual assault that she was a victim of
-F███████ went to the Fay School
-F███████s mother had pressured her into dropping out because once F███████ gets her mother on her side with things, she will tell her what to do and that things are not okay
-She knows this about her mother, because she heard her mother speaking on speaker phone to F███████
-There was a physical assault at the swimming pool on the diving team
-F███████ was on diving and one time she was in the hot tub and splashed someone
-The person she splashed gave her a death threat

-She heard this from F██████
-F██████'s mother was on the phone at the time this was being explained and her mother was saying things like that was not okay etc.
-She had heard from A███ M███ (Sp?) told her a different story than what F██████ told her
-When she says "██" she means "F██████" and her last name D█ S████

This is a synopsis of the interview, for the full interview, see the attachment to this case.

2. Case open.

**Exeter Police Department**
SUPPLEMENTAL NARRATIVE 1 FOR SERGEANT BRIAN HANNA
Ref: **21-231-OF**

1. On July 23, 2021 I spoke with the following individual on the phone:

### Meredith Murphy

███████████████

Murphy stated that her daughter F███████ D (AGE 16) had gone to a CAC interview in Brooklyn on Thursday. Murphy stated that since this interview, F███████ has been in distress. F███████ disclosed after the CAC to her parents that a student, ███████████████ had told M████ D████ in the hallway "that bitch should kill herself or I'll do it myself." F██████ overheard this statement and left the area. It was believed that this statement was directed at F███████. Murphy stated that at one point, already reported to EPD, ██████ had pulled a razor blade on F████████ in a dorm room.

2. Murphy explained that Det. Sgt. Ranauro was already investigating a case with F████████ and wanted this information passed along to him. Murphy wished to speak directly to a supervisor as she felt this report could not wait until Det. Sgt. Ranauro's return. I informed Murphy that I would document our conversation and forward it to Det. Sgt. Ranauro.

3. End of contact.

**Exeter Police Department**

SUPPLEMENTAL NARRATIVE FOR THEODORE SIERAD

Ref: 21-231-OF

Theodore Sierad
04/02/2021
21-131-OF
Supplemental Narrative

# EXHIBIT 6

# JACK KENT COOKE
## FOUNDATION

# Scholarship Agreement

The Jack Kent Cooke Foundation awards to:

## Fabriciana De Soriano

a Jack Kent Cooke Foundation **College Scholarship** beginning in the fall 2023 semester.

This award is subject to the Scholar's acceptance of the following terms:

**Part I.**        **Amount, Duration, Renewal, and Revocation of Scholarship**

1. The Cooke Foundation will award the Scholar funds for tuition and a stipend for the academic year. The exact amount of the scholarship will be based on information included in the Cost of Attendance Form submitted by the Scholar's four-year college or university, any institutional aid awarded, and the bills issued by the school. The total award for the year will not exceed $55,000 and generally will be less than that amount.

2. Scholars are encouraged to seek financial assistance from other sources and must apply for financial aid from their colleges for each year that they receive a Cooke scholarship. While Scholars may receive financial assistance from the federal/state government, scholarships/aid from foundations or corporations, or awards from their four-year colleges or universities without prior approval of the Cooke Foundation, they must notify us of all additional funding sources.

3. If the Scholar continues to meet the terms of this agreement, the Cooke Foundation may renew the scholarship annually until completion of the Scholar's undergraduate degree. Typically, scholarships are renewed three times, for a total of four years of support. The annual amount of the scholarship payment may vary from year to year.

4. At the end of each academic year, the Cooke Foundation will review the Scholar's grades, financial eligibility, conduct, progress toward degree, and cooperation with the Cooke Foundation and determine, at the Cooke Foundation's sole discretion, whether to renew the scholarship for the next academic year. The Cooke Foundation may also, at its sole discretion, revoke a scholarship during the academic year based on a similar review. Overall Scholar performance may also impact the likelihood of Cooke Foundation funding beyond the College Scholarship Program.

5. The Cooke Foundation may withdraw scholarship support at any time if the Scholar is involved in conduct that is criminal, is convicted of a crime, or is found by his or her institution to have violated academic standards. The Cooke Foundation may also withdraw scholarship support if the Scholar makes false or disparaging statements or engages in other conduct that could harm the reputation of the Cooke Foundation or its Staff.

6. Misrepresentation in the application, or in other materials submitted by the Scholar, will render this agreement null and void, and, at the discretion of the Cooke Foundation, the Scholar shall make full restitution to the Cooke Foundation of all scholarship funds paid.

7. Any change of institution during the undergraduate degree requires prior written approval of the Cooke Foundation if the scholarship award is to be paid to the new institution. Any major change in plans that will affect the use of the scholarship fund requires prior written approval of the Foundation.

**Part II.**        **Academic Standards**

Scholar's initials _~~jfl~~_ _____ Date _Apr 06, 2023_ _____

Parent's/Guardian's initials (required if scholar is under 18) _____ Date _____

1. The Cooke Foundation's academic standard is maintenance of a cumulative and term grade point average of a 3.0 on a 4.0 scale (or the equivalent). Students who do not maintain Cooke Foundation academic standards are at risk of probation and/or removal from the program.

2. Scholars must make substantial progress each semester toward the degree for which the Cooke Foundation is providing funding. Under this standard, Scholars are presumed to be attending studies full time.

3. The Cooke Foundation retains the right to change these standards on a case-by-case basis and from year to year.

**Part III.        Payment of Scholarship**

1. The Cooke Foundation issues scholarship funds to the Scholar's institution twice per year (three times for institutions using the quarter system). The first payment is mailed at the beginning of the academic year (August/September) and the second in mid-academic year (December/January). Payment is contingent on timely receipt of all scholarship requirements (i.e., transcript, bill, Cost of Attendance).

2. All scholarship funds are issued to the Scholar's institution.

3. If the Scholar withdraws from some or all classes before the end of the semester, the Cooke Foundation may ask the academic institution or require the Scholar to reimburse some or all of the scholarship.

4. Scholarship funds may not be used for activities that will benefit, supplement, or aid academic institutions or departments with which the Scholar is affiliated.

5. The Scholar is expected to report suspected fraud or unethical behavior in regard to this scholarship to the Cooke Foundation.

**Part IV.        Scholar's Responsibilities**

1. The Scholar is required to pursue a full-time, in person, course of study in an undergraduate degree program, beginning in the fall 2023 semester at an accredited, not-for-profit, four-year college or university of the kind listed in their application.

2. The Scholar must comply with the terms of this agreement.

3. The Scholar is required to attend the **Jack Kent Cooke Scholars Weekend, August 3-6, 2023**, in Lansdowne, VA. The Cooke Foundation will provide for travel expenses, lodging, and meals.

4. The Scholar must maintain consistent communication with their assigned Dean of Scholar Support at least once per term.

5. The Scholar must report any changes in name, telephone, or mailing and email addresses to the Cooke Foundation prior to that change taking effect. Active Scholars must remain subscribed to Cooke Foundation email services.

6. The Scholar must submit all scholarship requirements and return correspondence and phone calls from the Cooke Foundation promptly.

7. The Scholar must submit up to date emergency contact information. The Cooke Foundation will reach out to the emergency contact when the Scholar has not adhered to correspondence and communication expectations.

8. Ascertaining tax liability and reporting the applicable portion, if any, to the U.S. Internal Revenue Service is the sole responsibility of the Scholar.

9. The Scholar gives the Cooke Foundation permission to release images, information, and materials submitted by the Scholar (edited as needed) to the Cooke Foundation, including, but not limited to, the Scholar's name, biographical information, hometown, four-year college or university, intended degree, career goal, and photograph. The Scholar agrees to cooperate with reasonable requests to assist with the Cooke Foundation's

Scholar's initials _____ Date Apr 06, 2023 _____
Parent's/Guardian's initials (required if scholar is under 18) _____ Date _____

efforts to publicize the College Scholarship Program including, but not limited to, video productions, still photography, as well as traditional online media. The Cooke Foundation will not release individual course grades or personal financial information to the public.

10. The Scholar understands and agrees that the financial support being provided by the Cooke Foundation does not constitute employment.

11. The Scholar agrees that the Scholar shall at no time, during or after receipt of the financial support provided to the Scholar by the Cooke Foundation, make any disparaging comments about the Cooke Foundation or its employees, programs or services to any third party, whether traditional media, social media, in person or in print. The Scholar agrees that should the Scholar have any concerns or disputes regarding Cooke Foundation's employees, programs or services, the Scholar may communicate those to Cooke Foundation management in a confidential manner and will cooperate with the Cooke Foundation in all respects to resolve any such concerns or disputes.

12. For the duration of the scholarship, the Scholar hereby authorizes the undergraduate institution that the Scholar is attending to release any and all grade transcripts and financial aid information as needed by the Cooke Foundation to determine eligibility for renewal of the Cooke scholarship. By signing this form, the Scholar also, for the duration of the scholarship, gives explicit written consent to the undergraduate institution to provide the Cooke Foundation information collected from the Scholar's FAFSA (if applicable). The Cooke Foundation will use this financial information solely to make award determination and payment. The Cooke Foundation shall not sell or otherwise share such information. The Scholar further represents that the Scholar is at least eighteen (18) years of age and not a minor in the Scholar's state of residence or, if the Scholar is a minor in such state, that the Scholar's parents or guardians have signed this agreement as well.

13. The Scholar recognizes that the Cooke Foundation condemns racism, racial violence, white supremacy, hate speech, and bigotry in all forms, and is resolute in its commitment to foster an inclusive educational environment where every Scholar, alumnus, Staff member, and Grantee, or other member of its broader community is treated with dignity and respect. The Scholar will conduct him/her/themself in alignment with the Cooke Foundation's commitment to antiracism.

14. The Scholar recognizes that the Cooke Program Staff strive to provide the highest quality service in educational and career counseling. Such educational and career counseling, however, is not intended to diagnose, treat, or cure any health or mental health condition, and should not be viewed as a substitute for clinical care provided by a licensed health care provider, which is the Scholar's responsibility to seek, as needed. The Foundation is not responsible or liable for any loss, claim, or damage associated with a Scholar's mental or medical health condition, or decisions by the Scholar whether to seek or heed health or mental health advice.

**Part V.        Miscellaneous**

1. All terms of the online application and the application instructions found on the Cooke Foundation website are incorporated herein by reference.

2. The Cooke Foundation, Board of Directors, and Staff assumes no financial liabilities for any act or deed performed or any physical damage incurred by the Scholar in pursuing the proposed course of study as a part of the scholarship.

**I accept the Jack Kent Cooke Foundation College Scholarship. I certify that I have read the terms and conditions in this agreement and agree to abide by all the requirements for the duration of my scholarship.**

Cooke Scholar signature _____  Date Apr 06, 2023

Parent/guardian signature (required if Scholar is under 18) _____Date _____

Jack Kent Cooke Foundation College Scholarship Agreement – Page 3 of 3

# 2023 CS Scholarship Agreement

Final Audit Report                                          2023-04-06

| | |
|---|---|
| Created: | 2023-03-24 |
| By: | Hallie Park (hpark@jkcf.org) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAKDU6w0yZtTEFVQfsenEOvBBGddjHHT_M |

## "2023 CS Scholarship Agreement" History

Document created by Hallie Park (hpark@jkcf.org)
2023-03-24 - 5:39:13 PM GMT- IP address: 76.151.160.178

Document emailed to 1thesorianofamily@gmail.com for signature
2023-03-24 - 5:39:40 PM GMT

Email viewed by 1thesorianofamily@gmail.com
2023-03-24 - 5:39:47 PM GMT- IP address: 74.125.210.222

Email viewed by 1thesorianofamily@gmail.com
2023-03-28 - 1:30:13 AM GMT- IP address: 74.125.210.198

Email viewed by 1thesorianofamily@gmail.com
2023-03-29 - 10:25:55 PM GMT- IP address: 104.28.77.149

Email viewed by 1thesorianofamily@gmail.com
2023-03-30 - 10:40:56 PM GMT- IP address: 104.28.77.149

Email viewed by 1thesorianofamily@gmail.com
2023-03-31 - 5:05:39 PM GMT- IP address: 74.125.210.200

Email viewed by 1thesorianofamily@gmail.com
2023-04-01 - 7:36:01 PM GMT- IP address: 104.28.132.114

Email viewed by 1thesorianofamily@gmail.com
2023-04-02 - 5:44:31 PM GMT- IP address: 74.125.210.209

Email viewed by 1thesorianofamily@gmail.com
2023-04-03 - 6:55:55 PM GMT- IP address: 74.125.210.198

Email viewed by 1thesorianofamily@gmail.com
2023-04-04 - 2:28:08 PM GMT- IP address: 71.251.1.205

JACK KENT COOKE FOUNDATION  |  Powered by Adobe Acrobat Sign

Email viewed by 1thesorianofamily@gmail.com
2023-04-05 - 3:42:33 PM GMT- IP address: 74.125.210.199

Signer 1thesorianofamily@gmail.com entered name at signing as Fabriciana De Soriano
2023-04-06 - 5:04:49 PM GMT- IP address: 108.30.150.220

Document e-signed by Fabriciana De Soriano (1thesorianofamily@gmail.com)
Signature Date: 2023-04-06 - 5:04:51 PM GMT - Time Source: server- IP address: 108.30.150.220

Agreement completed.
2023-04-06 - 5:04:51 PM GMT

Names and email addresses are entered into the Acrobat Sign service by Acrobat Sign users and are unverified unless otherwise noted.



JACK KENT COOKE
FOUNDATION

Powered by
**Adobe**
**Acrobat Sign**

# EXHIBIT 7

 Gmail

Fabriciana De Soriano <fabricianadesoriano@gmail.com>

## Unpaid Internship Inquiry: Time Sensitive

3 messages

**Fabriciana De Soriano** <fabricianadesoriano@gmail.com>        Mon, Apr 24, 2023 at 2:38 PM
To: noah.bopp@schoolforethics.org

Hi Noah,

I hope this email finds you safe and healthy and that you have been well since we have last spoken!

As an Outreach Coordinator and Ambassador between SEGL and the former 2020 London and Leadership Cohort, and as an alum of the Fall 2020 Ethics and Leadership Class, I have loved being a part of the SEGL community and am grateful to be a member of the alumni network.

In addition to being a Jack Kent Cooke Young Scholar, I have also recently been selected as a College Scholar. As a rising College Scholar, I am eligible to apply for the $4,000 Cooke Internship Stipend for this summer to serve a nonprofit or a government organization. If the opportunity exists, I would love to further serve the SEGL community this summer through an unpaid internship. Do you anticipate needing any extra help this summer, possibly in New York City (where I am currently located) or anywhere else? I am very flexible to any and all opportunities (even remotely) to demonstrate my support. I will need to report back to the Foundation to apply for their funding no later than May 10th if I am able to secure an internship.

I hope to hear back from you soon! Thank you so much for your time and consideration, and if there is any further information I can provide, I am more than eager to. I am attaching my resume/cv for your reference, if needed.

Kindest regards,
Fabriciana De Soriano

 **Fabriciana De Soriano CV.docx.pdf**
179K

**Noah Bopp** <noah.bopp@schoolforethics.org>        Tue, Apr 25, 2023 at 8:05 PM
To: Fabriciana De Soriano <fabricianadesoriano@gmail.com>
Cc: Sam Novack <samuel.novack@schoolforethics.org>

Hi Fabriciana,

It's great to hear from you. Thank you for reaching out. I'd be happy to arrange a call to discuss this in the next few days (maybe early next week), and I have copied my assistant Sam, who can schedule us.

    --Noah

    **Noah Bopp**
    *Founder and Head of School*
    The School for Ethics and Global Leadership
    202.680.3264

[Quoted text hidden]

**Fabriciana De Soriano** <fabricianadesoriano@gmail.com>        Wed, Apr 26, 2023 at 10:26 AM
To: Noah Bopp <noah.bopp@schoolforethics.org>

Hi Noah,

Thank you so much for your email and the opportunity to talk. I have been in communication with Sam, and I greatly look forward to our conversation this Friday at 1pm.

Best,
Fabriciana
[Quoted text hidden]

# EXHIBIT 8

For the next section, please limit your responses to 300 words per response. The text box will expand as you type or paste in text.

## What are your current career aspirations?

Throughout the course of my career, I will be delving deeper into my research into self-monitoring and developing balanced social presences with guidance and influence on aspects of the human personality in leadership positions. I am intrigued by the abnormal manifestation in normal personalities, specifically centered around inconsistencies in behavior and decision-making, situationism, and redefining empathy. My goal is to prioritize and promote confidence and unapologetic critical and broad inquiry in psychology among my peers and the world. I will earn my PhD in Psychology, with a concentration in Ethics in Legal Advocacy and Psychosocial Justice, for a holistic approach to addressing systemic injustice. I hope to inspire redefinition to the field of psychology in its intersections with law and education and accessible achievement in the promotion of equity.

## How does this internship advance your ability to achieve your career goals?

As I reflect on my career aspirations, I can confidently say that an internship at SEGL would be a significant step towards achieving academic and professional goals. Through this internship, I would gain hands-on experience in interdisciplinary exposure to ethics, politics, and government which aligns with my research interests in ethics and behavioral patterns in political and legal psychology. As a scholar who is passionate about exploring the intersection between psychology, ethics, and leadership, I believe that an internship at SEGL would provide me with the opportunity to continue to learn about these topics from a practical, real-world standpoint with the organization again.

Interning with SEGL would allow me to network with professionals in my field and gain exposure to building on and making meaningful connections in academia. By collaborating with faculty, staff members, and students, I would build on my skills and gain insights into the challenges and opportunities that arise within seeking out roles in global leadership. I believe that this internship would provide me with a unique perspective on the field of psychology, ethics, and government, and help me build the skills and knowledge I need to be successful in my future endeavors.

I am excited about the prospect of becoming an SEGL intern and fellow and believe that it would significantly advance my ability to achieve my career goals. The hands-on experience, networking opportunities, and opportunity to give back to a community who has both greatly supported my education and worked to partner with the Foundation would help me continue to develop the skills and knowledge I need to make a positive impact in the field of psychology and use my leadership to give back to all communities who have supported me in my educational journey.

In two to three sentences, tell us about the organization and its purpose.

The School for Ethics and Global Leadership (SEGL) is an organization with a purpose to educate and develop young leaders who are ethically aware, globally competent, and prepared to tackle some of the world's most pressing issues. The program is designed to provide an opportunity for high school students to study leadership, ethics, and public policy in Washington, DC, and overseas, gaining real-world experience and building meaningful relationships with policymakers and change agents.

Why did you choose this organization?

I chose SEGL for quite a few reasons. After leaving Exeter following the sexual abuse and trafficking I endured there, I was feeling very anxious about what cutting ties with the institution would mean for my education, even my future. When I departed campus in March immediately after being assaulted by an administrator, I was experiencing a mix of emotions that month. At one point, I was worried that having spoken up and reported the felonies that took place would have been completely detrimental to my educational goals. However, at the end of March, I received an email from the foundation titled, "Choosing an Online Summer Program: Next Steps." SEGL was one of the first programs that had caught my eye as I had heard of it once before, and ultimately was one of the big steps in helping me to get back on my feet.

After participating in the London and Leadership Summer Term, I brought together 3 other peers from the course, two of whom were also JKCF scholars to work on an independent research program through Pioneer Academic's Open Summer Study program, ultimately helping us break through into publishing. We are currently awaiting publication for our spinoff of SEGL research into an analysis of Pandemics, Globalization, Policy, and Economics. This gave me, in addition to my peers, a way to further embody the school's mission and continue expanding my and our network(s). Looking for ways to stay engaged as a member of the alumni community, I became an ambassador and representative of my SEGL term cohort and had the opportunity through the Foundation to join their Fall Ethics Term. While I am not pursuing economics, my plans to study psychology with a concentration in Ethics in Legal Advocacy and Psychosocial Justice stem quite considerably from SEGL's support and inspiration to use my life experiences to empower others. I hope to inspire redefinition to the field of psychology in its intersections with law and education and accessible achievement in the promotion of equity and am already under consideration in top national and international psychology journals/websites for my manuscript in spreading awareness of these topics. I am excited about the prospect of serving SEGL and its community through a partnership with the Jack Kent Cooke Foundation once again. I am eager to contribute my skills and knowledge to help refine and lead the future development of quantitative informed solutions for today's ethical challenges and hope that with the Foundation's Internship Stipend, I can strengthen the bonds between the two organizations and contribute to them and each respective alumni network thriving even more.

Describe the projects that you and your internship supervisor have planned for the internship. What will be some of your specific responsibilities?

Throughout the course of this internship, I will fulfill 3 main responsibilities during the DC Summer Institute.

1. I will serve as Founder and Head of School Noah Bopp's Executive Assistant throughout this summer as a Full-Time Fellow. My role will consist of liaising with SEGL stakeholders to schedule and facilitate meetings with the founder. Additionally, I will work with him specifically to discuss plans for improving and innovating current tasks/events throughout the school.

2. My second major role will be as a Teaching Assistant/University-Level Formal Logic & Ethics Instructor. As a TA, I will mainly be helping to facilitate academic lessons and assist in developing the curriculum, scheduling and contacting guest speakers, running discussion groups, and setting up equipment. As a Formal Logic & Ethics Instructor (to be finalized), I will create curriculum, instruct, and lead case studies full time, given my certified background in Mathematical Logic, Psychology, and Ethics.

3. My third major responsibility will be as a Residential Assistant. This role will consist of my work in planning and supervising evening and weekend activities, mentoring students in the dorm, helping out with food prep, and involvement in residential life curriculum, such as discussions on ie. consent & race.

Some of my other specific responsibilities throughout the summer will consist of:
- Email communications
- Auditing and refreshing/redesigning the SEGL website.
- Developing sophisticated social media plan; strategizing and implementing reach
- Activating and revitalizing the graduate community


What do you hope to learn through this internship and what skills do you want to develop?

As a student with a passion for interdisciplinary work in psychology, ethics, and law, I am excited about the opportunity to learn and develop and build on new skills through an internship and fellowship with SEGL.

One area I hope to improve in is project and team management, which will be invaluable as I pursue leadership roles in the future. I want to learn how to effectively coordinate and communicate with team members to achieve shared goals in a formal organization, as well as how to adapt on the move and be flexible in coming up with swift solutions.

I also hope to work on my networking, alumni engagement, and communication. Noah and I were talking

about a program SEGL has done in the past named SEGL TV, where we invite guest speakers and alumni for panels and to discuss a wide range of topics based on what's going on in the world over zoom. As COVID-19 restrictions have been lifted to a certain extent, SEGL has resumed more in-person DC activities, but has not done as many SEGL TV sessions anymore. We discussed one way I can develop some of the skills I mentioned in this application are to bring back SEGL TV and reach out to alums, guest speakers, politicians, etc. to increase alumni and community engagement, widen our audience, and expand on a national and international yield.

I hope to hone my skills in attentive communication, cultural humility, and critical thinking to continue to work effectively with individuals from diverse backgrounds, consider different perspectives and approaches, and become accustomed to making connections on a broad global scale in the professional world. I am eager to immerse myself in the work of the organization and contribute to its mission while also building a strong foundation for my future career. I truly hope that JKCF will be able to fund this internship so I am able to serve SEGL and thus strengthen the bonds between SEGL and JKCF this summer!

What initial training will the organization provide so that you may be successful at this internship?

During the week of June 21st - 25th, SEGL teaching faculty will partake in a training orientation which I will attend.

How will you receive feedback and ongoing support from your supervisor throughout the internship?

I will work with Founder and Head of School Noah Bopp to continuously review my competencies he has reviewed and approved, and the roles I will fulfill throughout this internship.

# EXHIBIT 9

## JOB DESCRIPTION: TA/RA w/Teaching Assistant focus
The School for Ethics and Global Leadership
Summer Institute 2023

In accordance with the Jack Kent Cooke Foundation internship requirements, this internship is designed to provide 320 hours (roughly 10 hours/day for ~32 days) of hands-on job experience during the SEGL Summer Institute. The responsibilities below are not a replacement for the information already provided in the SEGL Faculty Handbook and other documents.

Teaching Assistant Responsibilities

- Be on time and present for all daily Morning Meetings (Monday-Friday)
- Check in with supervising faculty after Morning Meeting to confirm daily responsibilities
- Check in with supervising faculty daily about upcoming responsibilities
- Serve in a support role for academic sessions as assigned. This could include, for example, diagramming conversations, taking photos, helping to arrange chairs, traveling with students to speaker sessions, setting up lunch, researching topics/potential lesson plans as discussed/directed.
- Over time and if previous responsibilities are carried out well, new academic responsibilities may include facilitating rotating discussion groups, debriefing conversations, reaching out to guest experts, etc.
- Managing personal/family time so it does not interfere with professional responsibilities
- Model good behavior for students, including:
    - Personal hygiene (brushing/flossing teeth, showering daily, deodorant, etc.),
    - Non-verbal communication (taking notes, nodding in guest speaker sessions, etc.)
    - Proactive assistance with logistics (setting up/taking down)
    - No phone use in front of students
    - Dress guidelines
    - Kitchen protocols (closed-toed shoes)

Residential Responsibilities (when in the Residence, on-duty or not):

- Do not sign students out, supervise students alone, provide counseling (OK to mentor/direct at appropriate times); direct students to faculty members who are at least of college age
- Help students adhere to residential policies (following visitation rules, wearing closed-toe shoes in the kitchen, using sharp or hot items in the kitchen safely, communicating whereabouts, maintaining quiet after check-in, etc.)
- Assist with meal prep/set-up/cleanup as needed and time allows
- Do not spend time with students in your room. Students should **not** be in faculty rooms and faculty should limit the amount of time they spend inside student rooms.
- Join excursions, activities, etc. with guidance from supervising faculty members

- Model good behavior (as above, and also: bed time, noise levels, bathroom etiquette, etc.)

Post-Summer Institute Responsibilities

- TBD

Executive Assistant Responsibilities

- Scheduling meetings for Noah as requested using appropriate email etiquette
- All requests from Noah should be acted on the same day (or early the next morning if received in the late afternoon/evening)
- Other duties as assigned and agreed upon

# EXHIBIT 10

From: **Fabriciana De Soriano** fabricianadesoriano@gmail.com
Subject: Fwd: Confirming our conversation earlier today
Date: September 25, 2025 at 8:33 PM
To: Pamela Keith pamkeith@centerforemploymentjustice.com

Please see below. Thank you.

---------- Forwarded message ----------
From: **Denise Holmes** <dholmes@jkcf.org>
Date: Tue, Jul 18, 2023 at 6:41 PM
Subject: Confirming our conversation earlier today
To: <fabricianadesoriano@gmail.com>

Dear Fabriciana,

This is to confirm our conversation earlier today. After careful consideration, the Jack Kent Cooke Foundation has decided to discontinue your scholarship.

The terms of the scholarship agreement (specifically, Paragraphs 4, 5, and 6) provide that the Cooke Foundation will revoke a scholarship based upon several reasons, including your personal conduct. Your recent conduct as a summer intern runs counter to the Foundation's values and reflected negatively on the image of the Cooke Scholar community. We also have concerns about your academic progress, specifically misrepresentations that were made in materials that were provided to the Cooke Foundation with your College Scholar application materials.

As a result of these serious violations of your scholarship agreement, the Foundation is revoking your scholarship and your affiliation with the Cooke Foundation, effective immediately. Although you will no longer be part of the Cooke Scholarship program, the Cooke Foundation would like you to be able to continue your education this next year and support you in this transition. We are able to provide you with a lump sum of $20,000 in exchange for your signing a release that I have attached. Please review the agreement and let me know of any questions.

Regardless of whether you sign the agreement, please understand that (1) this decision is final; (2) this agreement is only available through this Friday, July 21 and after that it is withdrawn and will not be re-extended to you; and (3) if you do not sign and return the Release Agreement, you will not receive the transition payment. Again, the revocation of your scholarship is effective today, regardless of whether you sign the agreement.

We wish you the best in your future endeavors.

Sincerely,

Denise Holmes

This email was sent to fabricianadesoriano@gmail.com by Denise Holmes.
Unsubscribe from General Cooke Foundation Communications.



De Soriano -
Settle...23.pdf